# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

DAVID WHEELER,

                              Plaintiff,

       v.                                             3:15-CV-105
                                                        (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

PETER A. GORTON, ESQ., for Plaintiff
DAVID L. BROWN, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, by the Honorable Mae A. D'Agostino, United States District Judge, by Order dated July 24, 2015 (Dkt. No. 14), in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1, and the consent of the parties.

## I.    PROCEDURAL HISTORY

On October 16, 2012, plaintiff filed an application for Disability Insurance Benefits ("DIB"), claiming disability beginning on May 24, 2012. (Administrative Transcript ("T") 147-48). The application was denied initially, and plaintiff requested a hearing which was held on January 8, 2014, before Administrative Law Judge ("ALJ") F. Patrick Flannagan. (T. 27-74). On June 27, 2014, ALJ Flannagan issued a decision denying benefits. (T. 10-20). The ALJ's decision became the final decision of the

Commissioner when the Appeals Council ("AC") denied plaintiff's request for review on January 6, 2015. (T. 1-4).

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is

2

whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920. The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that her impairment prevents her from performing

her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin,*

*Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence

is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more

than a scintilla" of evidence scattered throughout the administrative record. *Id.*

However, this standard is a very deferential standard of review " – even more so than

the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III. FACTS

Plaintiff's brief includes a summary of most of the medical and testimonial evidence in the record. (Pl.'s Br. at 1-5) (Dkt. No. 13). Defendant has only incorporated the "procedural statement" contained in the first two pages of plaintiff's brief, and has instead relied heavily on the ALJ's findings. (Def.'s. Br. at 1, 3-4). The

court will incorporate the facts as stated by both plaintiff and the ALJ with additions and exceptions as noted below in discussing the specific issues raised by plaintiff.

## IV.   **ALJ'S DECISION**

The ALJ determined that plaintiff met the insured status requirement for disability benefits through December 31, 2015.  After finding at step one of the disability analysis, that the plaintiff has not engaged in substantial gainful activity since the alleged May 24, 2012 onset date, the ALJ found that plaintiff had the following severe impairments at step two: degenerative disc disease of the cervical and lumbar spine, degenerative joint disease of the left knee, degenerative joint disease of the right shoulder, status post September 2012 arthroscopic shoulder repair, and chronic obstructive pulmonary disease ("COPD"). (T. 12).

The ALJ found that although plaintiff has been "medically managed" for alcohol abuse, cirrhosis of the liver, history of alcoholic cardiomyopathy, abdominal pain, right wrist fracture, unspecified sleep apnea, gastroesophageal reflux disease ("GERD"), syncope secondary to dehydration, and acute eye injury due to bleach, these impairments were not "severe" within the meaning of the regulations.[1] (T. 13).  Finally,

---

[1] Plaintiff had a "mildly" enlarged liver, with diffuse fatty infiltration, but there was no evidence of a "focal mass," his cirrhosis was "stable," and his abdominal pain was "improved." (T. 13) (citing Ex. 2F at 18, T. 376).  Plaintiff had no history of jaundice, bleeding episodes, or any other liver complications. (T. 13) (citing Ex. 5F at 1, T. 430).  Plaintiff's wrist fracture had fully healed, Dr. Gilbert Jenouri's consultative examination showed that plaintiff's hand and finger dexterity were intact, and he had full bilateral grip strength. (T. 13) (citing Ex. 5F at 1, 4, T. 430, 433).  Plaintiff's sleep apnea was never investigated or medically determined. (T. 13) (citing Ex. 2F at 18, 36, T. 376, 394).

the ALJ found that plaintiff's depression was "minor," and it did not impair his "functionality." (T. 13) (citing Ex. 4F at 1-5, T. 425-429). The ALJ did state that, even though he found that some of plaintiff's impairments were not "severe," the "limiting effects of all of the claimants' physical impairments were considered in determining the claimant's [RFC]." (T. 13). With respect to plaintiff's mental impairment, the ALJ considered the "four broad functional areas" listed in the regulations for evaluating mental disorders and found that plaintiff's mental impairment caused no more than "mild" limitations in the first three areas, with no episodes of "decompensation" for the fourth area. (T. 14-15).

At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or equaled the severity of a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (T. 15-16). The ALJ compared plaintiff's impairments to Listing 1.02A or 1.02B (major dysfunction of a joint), 1.04 (disorders of the spine), 3.02 (chronic pulmonary insufficiency), and 3.03 (asthma). (T. 16).

The ALJ determined that plaintiff had the RFC to perform light work because he could lift and/or carry twenty pounds occasionally and ten pounds frequently.[2] (T. 16). Plaintiff could stand and/or walk for six hours in an eight-hour work day and could sit for six hours in an eight-hour work day. (*Id.*) Plaintiff could occasionally climb,

---

[2] As discussed below, the ALJ expressed a slightly different RFC with respect to lifting when he asked the VE his hypothetical question at step five.

balance, stoop, kneel, crouch, and crawl. He could not reach overhead with his right

upper extremity, but he could occasionally reach in all other directions with the right

upper extremity. Finally, the ALJ found that plaintiff must avoid concentrated

exposure to respiratory irritants such as fumes, odors, dust, and gases. (*Id.*)

The ALJ called a Vocational Expert ("VE") to testify at plaintiff's hearing. The

VE's testified that plaintiff could not perform his past relevant work. The ALJ found

that plaintiff also had impairments which would "impede" the ability to perform all or

substantially all the requirements of light work.[3] (T. 19). In response to a hypothetical

question outlining plaintiff's limitations, the VE testified that plaintiff would still be

able to perform jobs that exist in significant numbers in the national economy. (T. 18-

20).

## VI.    ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1.    The ALJ's RFC determination is not supported by substantial

---

[3] Under 20 C.F.R. § 404.1567(b), light work involves:

[L]ifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds. Even though the weight
lifted may be very little, a job is in this category when it requires a good
deal of walking or standing, or when it involves sitting most of the time
with some pushing and pulling of arm or leg controls. To be considered
capable of performing a full or wide range of light work, you must have
the ability to do substantially all of these activities. If someone can do
light work, we determine that he or she can also do sedentary work,
unless there are additional limiting factors such as loss of fine dexterity
or inability to sit for long periods of time.

evidence. (Pl.'s Br. at 5-11) (Dkt. No. 13).

2.  The ALJ failed to properly consider the limitations caused by plaintiff's COPD/Emphysema. (Pl.'s Br. at 11-13).

3.  The ALJ's step five determination is not supported by substantial evidence because the VE's opinion was based on an incomplete hypothetical question. (Pl.'s Br. at 13-16).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed. (Dkt. No. 15).  This court finds that the ALJ's RFC determination regarding plaintiff's capacity for prolonged walking, standing, and sitting is not supported by substantial evidence.  Although other aspects of the ALJ's RFC determination are supported by substantial evidence, I am constrained to order remand for further evaluation of plaintiff's RFC.

## V.  RFC/TREATING PHYSICIAN

### A.  Legal Standards

#### 1.  RFC

In rendering a residual functional capacity ("RFC") determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Id.* (citing, *inter alia*, *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)).  RFC can only be established when there is substantial evidence of each

physical requirement listed in the regulations. *Id.* (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120 (DNH/GHL), 2010 WL 3825629, at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

Social Security Ruling ("SSR") 83-10 elaborates on the requirements of light work:

> Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. . . . Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk.

### 2. Treating Physician

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is *not* required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that a report of a treating physician is rejected. *Id.* An ALJ may not arbitrarily substitute his/her own

judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). When controlling weight is not given, the ALJ should consider the following factors to determine the proper weight assigned to a treating physician's opinion: (1) frequency of the examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist. See 20 C.F.R. § 404.1527(c); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

## B. Application

In this case, plaintiff argues that the ALJ erred in determining that plaintiff could perform light work. Plaintiff argues that the ALJ's determination fails to "account for the full extent of Plaintiff's limitations caused by the impairments to his knee, back, and shoulder,"[4] and in doing so has given insufficient weight to the treating physician's RFC assessment. (Pl.'s Br. at 6). Specifically, plaintiff argues that the ALJ erred in giving "significant weight" to consultative physician Dr. Gilbert Jenouri, while giving "no" weight to Dr. Cherilyn White, plaintiff's treating physician. (*Id.*)

Dr. White has been plaintiff's treating internist at least since 2011,[5] and plaintiff

---

[4] Although plaintiff begins his argument by alleging that the ALJ failed to take account of the full extent of the limitations caused by plaintiff's knee, back, and shoulder, the plaintiff focuses his argument on the limitations allegedly caused by plaintiff's shoulder, which plaintiff refers to as "the most significant impairment in this case." (Pl.'s Br. at 7, 5-11). This court will analyze plaintiff's argument with respect to all the limitations which resulted in the ALJ's RFC determination.

[5] In a medical report, signed by Dr. White on December 24, 2011, she states that plaintiff was an "established patient," but that she had not seen him in "at least three years." (T. 411). When plaintiff had his ATV accident in 2012, plaintiff's "PCP" was listed as Dr. Robert T. McClelland from the Guthrie Clinic in Sayre, PA, even though plaintiff's address was listed as Waverley, NY. (T. 271). Dr. White is in Cortland, NY. (T. 447). Medical records from 2006 also list Dr. McClelland as

testified in 2014, that he had been seeing Dr. White "for more than ten years." (T. 43). On September 1, 2014, Dr. White responded to a "Questionnaire," which appears to have been sent to Dr. White by plaintiff's counsel, in which the doctor checked boxes indicating that plaintiff could lift only 0-5 pounds up to three hours per day and should never lift anything over five pounds. (T. 463). Dr. White stated that plaintiff could sit for "approximately" less than one hour out of an eight-hour day and could stand/walk for "approximately" less than one hour out of an eight-hour day. In addition, plaintiff would have to change positions approximately every fifteen minutes. (*Id.*) Dr. White checked boxes indicating that plaintiff could use his right hand for fine motor activity only up to one third of each working day, but could use his left hand for "more than [one third] of every working day." (T. 464). Plaintiff could use his right arm and hand for reaching and handling less than one third of every work day, but could use his left arm and hand for reaching and handling for more than one third of every working day. (T. 464).

The Questionnaire also asked about the effects of plaintiff's medical conditions. Dr. White checked boxes indicating that plaintiff's conditions would cause pain and fatigue. (T. 462) She also answered "yes" to questions asking whether the plaintiff's conditions, his pain, or the side effects[6] of his medications would diminish plaintiff's concentration and work pace. Dr. White also answered "yes" to a question asking whether plaintiff's conditions would also cause him to need a "rest at work." (*Id.*) The

---

plaintiff's primary care physician. (T. 272). It is clear that Dr. White is plaintiff's current PCP.

[6] Side effects were listed as fatigue, constipation, and decreased reaction time. (T. 463).

Questionnaire then asked whether pain, fatigue, diminished concentration, diminished work pace, or need to rest would lead plaintiff to be "off task" during the work day. (T. 462). Dr. White answered that plaintiff would be "off task" for "[m]ore than 33% of the day. (*Id.*) Plaintiff would have "good and bad" days, and the "bad" days would cause plaintiff to likely miss work more than four days per month. (T. 463).

By contrast, Dr. Jenouri found that plaintiff had only a "mild restriction to heavy lifting and carrying and activities requiring fine and gross motor activity using the right upper extremity." (T. 433). Dr. Jenouri also examined plaintiff's hands and fingers, finding that plaintiff's dexterity was "intact," and his grip strength was 5/5 bilaterally. (T. 433). Dr. Jenouri also found that the plaintiff should avoid smoke, dust, or other respiratory irritants.[7] (*Id.*) Dr. Jenouri did not comment on any limitations to plaintiff's ability to sit, stand, or walk and did not mention any limitations on plaintiff's left upper extremity. (T. 433).

The ALJ gave Dr. White's 2014 RFC no weight because it was inconsistent with the "overall medical evidence," Dr. Jenouri's report, and Dr. White's own treatment notes. (T. 18). The ALJ stated that Dr. White's opinion that plaintiff could not stand for more than one hour at a time was inconsistent with her treatment notes, in which she found that plaintiff had normal gait and station and normal alignment and mobility of the spine. (T. 18). The ALJ found that Dr. White did not explain her statement that plaintiff required frequent position changes or engage in activities higher than waist

---

[7] Dr. White did not mention any limitations with respect to plaintiff's COPD, but the court notes that the Questionnaire did not address plaintiff's COPD or ask about limitations associated with that impairment. (T. 462-64).

level because "there is no evidence of an impairment with the claimant's dominant upper left extremity." (*Id.*)

The ALJ's decision to afford no weight to Dr. White's very restrictive 2014 RFC is supported by substantial evidence. Dr. White's most recent report prior to the RFC evaluation is dated July 12, 2013.[8] (T. 447-52). A review of Dr. White's office notes show that none of these severe restrictions are mentioned. (T. 359-422, 446-48). In her July 12, 2013 report, she found that although his "[s]houlder was back to kill him again," and complained of "joint pain," he had full range of motion in his neck, his gait and station were "normal," his head and neck had "normal alignment and mobility," and his spine, ribs, and pelvis had "normal alignment and mobility [with] no deformity." (T. 449-50).

With respect to his right upper extremity, although the report states that plaintiff had "[p]ain with movement in any direction more than 90 degrees," flexion was "fine to 120 deg.," extension to 50 degrees, abduction to 100 degrees, internal rotation was normal, and external rotation was to 40 degrees. (T. 450). Plaintiff's left upper extremity had normal range of motion and strength. Plaintiff had normal sensation, and had no impairment in his coordination. (T. 450). In the section entitled "Depression Screening," the report states that plaintiff denied any depression at all. (T. 447).

The July 2013 report states that coordination tests showed that plaintiff had no dysmetria (poor control of his range of movement), had normal rapid alternating

---

[8] There are no actual medical reports in the record from Dr. White between July 12, 2013 and the September 1, 2014 Questionnaire.

movements, his finger-to-nose and heel-to-shin testing were within normal limits, and

he had a negative Romberg[9] test. (T. 450). The court notes that this is totally

inconsistent with plaintiff's testimony that he cannot keep his balance and is constantly

falling.[10] (T. 55). At the hearing, plaintiff stated that he never mentioned his alleged

balancing problem to Dr. White, but clearly her coordination testing showed that

plaintiff did not lose his balance. In her July 12, 2013 report, other than the statement

about normal alignment and mobility, Dr. White never mentioned examination of, or

any limitations related to, plaintiff's back. There is also no mention of any dexterity or

grip strength tests of either hand, thus, it is unclear how she determined that plaintiff

would only be able to use his right hand for fine motor activity only one third of the

day.[11]

Although the "depression screening" was positive in Dr. White's February 5,

2013 report, suggesting that plaintiff's "functionality was impaired," and although he

---

[9] A Romberg test is a balancing test, in which the individual stands with his or her heels together and eyes closed. If the individual loses his or her balance, the test is positive. https://informatics.med.nyu.edu/modules/pub/ neurosurgery/coordination.html.

[10] The court notes that the ALJ found that plaintiff was not "fully credible" and analyzed his credibility extensively. (T. 17-18). The ALJ did not question that plaintiff suffered from a degree of pain; rather, the ALJ found that the plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not fully credible. (T. 17). Plaintiff does not specifically challenge the ALJ's credibility determination, and the court finds that the ALJ's determination is supported by substantial evidence.

[11] In any event, it is unclear what impairment would have been associated with this alleged loss of fine motor activity. The shoulder impairment affected plaintiff's ability to reach, but as the ALJ pointed out, plaintiff's wrist fracture was completely healed and examination revealed intact hand and finger dexterity. (T. 13). Any limitation on dexterity would have been due to plaintiff's wrist, not his shoulder. Dr. White never discussed or examined plaintiff's wrist, nor did she assess any limitations due to his wrist. Thus, the ALJ was correct in rejecting Dr. White's findings regarding plaintiff's motor activity.

14

stated that his condition would make it "very difficult" to get along with others, plaintiff denied feeling "bad" about himself and denied trouble "concentrating." (T. 454). Despite complaints of "joint pain," plaintiff "denied back pain," joint swelling, body aches, muscle cramps, muscle weakness, stiffness, or recent injury. (*Id.*) Once again, plaintiff's gait and station were "normal," and his spine, ribs, and pelvis were all in normal alignment, had "normal mobility," and no deformity. (T. 456). The plaintiff was able to touch the back of his head with his right upper extremity, but it "catches on the way down." (*Id.*) There was "crepitus" mid-rhomboid with flexion and extension, and plaintiff had pain on internal rotation. However, there was no clubbing, cyanosis, edema, or varicosities. (*Id.*) Plaintiff did have shoulder pain, and it was listed as "unchanged," but his COPD was listed as "improved." (T. 457).

In November of 2012, Dr. White indicated that plaintiff's shoulders were a bit forward, his right arm was in a sling after his rotator cuff surgery, he had a flattened lordosis, and his hips rocked forward. However, there was no indication that plaintiff moved slowly[12] or the he lost his balance. (T. 362). Dr. White noted that although he had shoulder pain, the pain, his COPD, his alcohol abuse, and his smoking had "improved."

(T. 263). In October of 2012, plaintiff's gait and station were the same, he did have shoulder pain, but his COPD was asymptomatic except for a cough. (T. 370). In September of 2012, plaintiff denied back pain, joint swelling, muscle aches, cramps,

---

[12] Plaintiff also testified that although he could only sit for fifteen minutes at a time, it would take him twenty minutes to get up and thirty minutes to go upstairs to the bathroom. He had to have his grandson help him around. (T. 50-51).

weakness or stiffness. (T. 374). The court notes that Dr. White never estimated what functions plaintiff would or would not be able to perform, nor did she discuss any limitations from his impairments until the January 2014 Questionnaire.

With respect to the lifting requirement for light work, Dr. White stated in the 2014 Questionnaire, that plaintiff could not lift more than five pounds, but did not specify whether this limitation was "bilateral." There is no impairment in plaintiff's left shoulder, and the ALJ found that plaintiff could not reach overhead with his *right* upper extremity. (T. 16). And although the RFC in the ALJ's *decision* does not differentiate between left and right with respect to plaintiff's ability to lift, the court notes that the hypothetical question that the ALJ asked the VE specifically stated that plaintiff could "lift 20 pounds occasionally and 10 pounds frequently with . . . the dominant left arm and hand," could do no overhead lifting with the non-dominant right arm and could occasionally use the non-dominant right arm for other reaching, but could frequently handle finger and feel with the right hand.[13] (T. 63).

The ALJ did address the limitations imposed by plaintiff's shoulder impairment on the right side,[14] and his finding regarding plaintiff's ability to lift is supported by

---

[13] Any error in the ALJ's written opinion is harmless because the hypothetical question posed to the VE did have the appropriate limitations expressed. The hypothetical question made it clear that the lifting of 20 pounds frequently and 10 pounds occasionally would be performed by the dominant left hand which was not injured, and the impaired right upper extremity would be used only for occasional reaching (except overhead) and frequent handling, fingering and feeling. (T. 62-63).

[14] Plaintiff argues that Dr. Jenouri could not have assessed the limitations imposed by his right shoulder because at the time of Dr. Jenouri's evaluation, plaintiff's shoulder was in still in a sling and immobile after rotator cuff surgery. Plaintiff is correct that Dr. Jenouri states he did not examine plaintiff's right shoulder due to "immobility," but as stated herein, the ALJ addressed plaintiff's shoulder impairment by limiting the plaintiff's lifting to his left arm, noting that plaintiff could not lift

16

substantial evidence. Thus, to the extent that Dr. White's RFC was inconsistent with her own treatment notes and with Dr. Jenouri's report, the ALJ's failure to give it any weight is not in violation of the treating physician rule and is supported by substantial evidence.[15] However, this does not end the analysis.[16]

Notwithstanding the fact that many aspects of the ALJ's RFC determination were supported by substantial evidence, his findings regarding plaintiff's capacity for prolonged standing, walking, and sitting were not adequately supported by the medical opinion evidence. Dr. Jenouri did not comment on any limitations on plaintiff's ability to sit, stand, or walk.[17] There are no other RFC evaluations from examining physicians, other than Dr. White's restrictive Questionnaire, opining on plaintiff's ability to perform these functions. The one RFC in the record which states that plaintiff can perform the sitting, standing, and walking requirements of light work appears to be

---

[16] overhead on the right, and stating that he only needed the right side to occasionally reach as well as to frequently handle, finger, and feel. (T. 63).

[15]

[16] Dr. Jenouri found that plaintiff would have "mild restriction to heavy lifting and carrying and activities requiring fine and gross motor activity using the right upper extremity." (T. 433) (emphasis added). This finding is not inconsistent with the ability to engage in the lifting requirements of light work, and because there are no impairments to plaintiff's left upper extremity, it would be logical for Dr. Jenouri to omit any limitations for plaintiff's left arm.

[17] The court notes that the plaintiff finds fault in Dr. Jenouri's opinion for failing to mention plaintiff's knee surgery, stating that this makes his examination "questionable at best." (Pl.'s Br. at 6). However, plaintiff's treating physician, Dr. White does not even list plaintiff's knee or his surgery as a "problem" in her November 12, 2012 list of "problems," nor does she state that she examined plaintiff's knees in her examination notes. (T. 416-19). In fact, in the Questionnaire, Dr. White did not list plaintiff's knee in the "conditions" for which she examined him. (T. 462). Dr. Jenouri did examine plaintiff's knees and found "full ROM of knees and ankles bilaterally." (T. 432). Thus, the fact that Dr. Jenouri failed to mention a surgery that was performed years ago is not an error, and it does not diminish the value of his report.

authored by a "single decision maker" ("SDM") who is not a physician, and who does not appear to have seen any of the treating physician's records. (T. 81-84).

The omission of any conclusion by a consultative examiner regarding prolonged sitting or standing could not have been reasonably construed by the ALJ as a conclusion that plaintiff satisfied the sitting or standing requirements of light work, without seeking clarification from the doctor. *See, e.g.*, *Vongsouvanh v. Comm'r of Soc. Sec.*, No. 6:13-CV-1581 (TJM/ATB), 2015 WL 926200, at *10 (N.D.N.Y. Mar. 3, 2015) (the omission of any conclusion from the consulting examiner regarding prolonged sitting could not have been reasonably construed by the ALJ as a conclusion that plaintiff could sit for six hours in an eight-hour day); *DiVetro v. Comm'r of Social Sec.*, No. 5:05-CV-830 (GLS/DEP), 2008 WL 3930032, at *12 (N.D.N.Y. Aug. 21, 2008) (the record lacks any assessment from either a treating source or a consultant supporting a finding of plaintiff could sit for eight hours in a given workday; this portion of the ALJ's RFC determination was not well-supported); *Tricic v. Astrue,* No. 6:07-CV-997 (NAM), 2010 WL 3338697, at *3-4 (N.D.N.Y. Aug. 24, 2010) (the ALJ's determination that plaintiff could stand/walk and sit for about six hours in an eight-hour workday was not supported by substantial evidence where two treating doctors opined that plaintiff should avoid prolonged sitting and/or standing, and no examining doctor provided a specific opinion about plaintiff's ability to sit or stand for particular periods of time). It is possible that Dr. Jenouri could have intended the interpretation made by the ALJ, but without further support, the case law dictates that such interpretation is insufficient. Because the ability to stand and walk is critical to the finding that plaintiff

can perform light work, the case must be remanded for further evaluation of plaintiff's

ability to sit, stand, and walk.[18]

Plaintiff also alleges that the ALJ failed to properly address the "effect" of

plaintiff's COPD. Plaintiff argues that although Dr. Jenouri found that plaintiff should

"avoid" smoke, dust, or other known respiratory irritants, his RFC stated that plaintiff

must avoid "concentrated" exposure to respiratory irritants such as fumes, odors, dust,

and gases. (T. 16, 433). Plaintiff interprets the term "avoid" as the "ability to tolerate

very little irritants," which according to plaintiff has "a considerable impact on the

occupational base." (Pl.'s Br. at 12) (citing SSR 85-15). Plaintiff argues that the ALJ

gave the incorrect environmental restriction to the VE.

This court does not agree. In support of his argument, plaintiff cites *Long v.*

*Colvin*, 3:13-CV-578, 2013 WL 3051601, at *6 (N.D.N.Y. June 17, 2013) for the

proposition that a restriction to avoid exposure to odors or dust "directs that evaluations

must be conducted on *an individual basis*." (Pl.'s Br at 12) (citing *Long, supra*

(emphasis in original) & SSR 85-15). However, the court in *Long* stated that where a

person has a medical restriction to avoid "excessive" amounts of "noise, dust, etc." the

impact on the ability to work would be minimal because most job environments do not

contain those environmental irritants. But, where an individual can tolerate "very little"

noise, dust, or other irritants, the impact on the ability to work would be considerable,

---

[18] The court notes that although the plaintiff has the burden of proof during the first four steps
does not mean that the ALJ may find an RFC without substantial evidence to support it. *Staggers v.*
*Colvin*, No. 3:14-CV-717, 2015 WL 4751123, at *4 (D. Conn. Aug. 11, 2015) (citing *Selian v. Astrue*,
708 F.3d 409, 421 (2d Cir. 2013)).

and where the restriction falls somewhere in between, "resolution of the issue will generally require consultation of occupational reference materials or the services of [a VE]." *Id.* (citing SSR 85-15).

In this case, the ALJ used a VE, and there is no indication that the ALJ's interpretation of Dr. Jenouri's statement was incorrect. This is particularly so because, notwithstanding Dr. White's suggestion that plaintiff quit smoking, he has not done so for years. While plaintiff testified at the January 8, 2014 hearing that he was "down to" one or two cigarettes per day, in November of 2012, plaintiff was still smoking 20-40 cigarettes per day; in February of 2013, he estimated that he smoked 40 cigarettes per day; and on July 12, 2013, he was still smoking 20-40 cigarettes per day. (T. 56, 447, 453). Yet, Dr. White never assessed any limitations based on plaintiff's COPD.[19] Thus, the ALJ's determination that plaintiff should avoid "concentrated" exposure to environmental irritants is supported by substantial evidence.

## VII. <u>VOCATIONAL EXPERT/HYPOTHETICAL QUESTION</u>

### A. **Legal Standards**

If a claimant is unable to perform a full range of a particular exertional category of work, or the issue is whether a claimant's work skills are transferable to other jobs, then the ALJ may utilize the services of a vocational expert. 20 C.F.R. §§ 404.1566, 416.966. A vocational expert may provide testimony regarding the existence of jobs in

---

[19] The court also notes that Dr. White's reports indicate both that plaintiff smokes and that he is subject to "passive smoke exposure," meaning that someone else in his home smokes, but apparently has not stopped despite plaintiff's COPD. (T. 447, 453). On July 12, 2013, Dr. White found that plaintiff still smoked 20-40 cigarettes per day, notwithstanding that he was told to quit. (T. 449).

the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations. *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

If the ALJ utilizes a VE at the hearing, generally, the VE is questioned using a hypothetical question that incorporates plaintiff's limitations. *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981). Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence, *see Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983), a hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony. *See De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996). Conversely, the ALJ may rely on a VE's testimony regarding the availability of work as long as the hypothetical facts the expert is asked to consider are based on substantial evidence and accurately reflect the plaintiff's limitations. *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009). Where the hypothetical is based on an ALJ's RFC analysis, which is supported by substantial facts, the hypothetical is proper. *Id*. at 276-277.

## B.    Application

Plaintiff argues that the ALJ asked an incomplete hypothetical, in which the RFC was not supported by substantial evidence. This court finds that because the ALJ's finding with respect to plaintiff's ability to sit, stand, or walk was not supported by substantial evidence, the hypothetical question was similarly flawed. On remand the

ALJ must formulate hypothetical questions to a VE so that they conform to an RFC determination that is supported by substantial evidence.

Plaintiff also argues that in addition to the alleged errors in the hypothetical question, the VE's answer did not identify jobs existing in "significant numbers" in the national economy. (Pl.'s Br. at 15-16). In *Koutrakos v. Colvin*, Magistrate Judge Joan Margolis discussed the "significant numbers issue" and reviewed the some of the case law discussing whether "significant numbers" existed. *Koutrakos v. Colvin*, No. 3:13-CV-1290, 2015 WL 1190100, at *20-22 (D. Conn. Mar. 16, 2015). Magistrate Judge Margolis first pointed out that "[n]either the Social Security Act, nor the Commissioner's Regulations or Rulings provide a definition for a 'significant' number of jobs." *Id.* at *21. The court is generally guided by numbers that have been found "significant" in other cases. *Id.* (citing *Schadenfroh v. Colvin*, No. 09-CV-223, 2014 WL 1260123 (S.D. Ind. Mar. 27, 2014)). Significant numbers include 408 jobs in the regional economy and 98,008 jobs in the national economy; and 180 jobs in the regional economy and 40,027 jobs nationally. *Barbato v. Astrue*, No. 09-CV-6530, at *7 (W.D.N.Y. July 7, 2010) (citing *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (1400 jobs was significant)[20] (citing cases); *Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) (174 jobs in the local economy, 1600 in the state, and 80,000 in the national economy were significant); *Dumas v. Schweiker*, 712 F.2d 1545, 1549, 1553-54 (2d

---

[20] Although the court in *Lee* did not specify that it was referring to the "local" economy, the case that it cited for the proposition that 1350 jobs was "significant" was a case in which the number was referring to numbers in the local economy. 988 F.2d at 794 (citing *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988)).

Cir. 1983) (150 jobs in the local economy and 112,000 in the national economy)). In *Fox*, *supra*, the court found that 200 surveillance system monitor jobs in the Central New York Region were significant. *See also Roe v. Colvin*, No. 1:13-CV-1065, 2015 WL 729684, at *7 (N.D.N.Y. Feb. 19, 2015) (630 jobs locally and 44,000 nationally was significant); *McCusker*, 2014 WL 6610025, at *3 (100 jobs in the Capital Region; 2,250 in New York State, and 74,470 nationally was significant); *Gray v. Colvin*, No. 12-CV-6485, 2014 WL 4146880, at *6 (W.D.N.Y. Aug. 19, 2014) (60 jobs regionally, but over 16,000 nationally was significant).

In *Koutrakos v. Colvin*, the court questioned whether 85 jobs in the state of Connecticut were a "sufficient number" of surveillance system monitor jobs. However, the VE in *Koutrakos* also testified that there were 1,296 information clerk jobs in Connecticut and 152,000 nationally, which was a significant number. 2015 WL 1190100, at *22 (citing inter alia *Durante v. Colvin*, No. 13-CV-1298, 2014 WL 4843684, at *5 (D. Conn. Sept. 29, 2014) (finding that 660 positions in the state of Connecticut is a significant number); *Dugan v. Soc. Sec. Admin. Comm'r*, 501 F. App'x 24, 25 (2d Cir. 2012) (noting VE's testimony that there were two jobs with a total of 600 positions in Vermont and 344,000 nationwide)). Because of the additional job with a more extensive number of positions in the state of Connecticut, the court in *Koutrakos* affirmed the Commissioner's determination and found that the VE had cited significant numbers of jobs that the plaintiff could perform.

In *Vining v. Astrue*, 720 F. Supp. 2d 126, 136 (D. Me. 2010), the court found that "assuming" that 30 jobs in the state of Maine is ***not*** a "significant" number in the region

where plaintiff lives," 11,000 nationwide was a "significant number in several other regions of the country." However in *Leonard v. Heckler*, 582 F. Supp. 389, 391 (M.D. Pa. 1983), the court held that 4,000 to 5,000 jobs nationwide was ***not*** a significant number, given that it was "a minuscule fraction of the number of jobs existing in the national economy." The court in *Vining* estimated that "numbers of jobs in the ballpark of 10,000 to 11,000 nationwide have been held 'significant.'" 720 F. Supp. 2d at 136 (citing inter alia *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (200 jobs in Iowa and 10,000 nationally was significant); *McGee v. Astrue*, No. 08-831, 2009 WL 2841113, at *6 n.14 (W.D. La. Aug. 28, 2009) (150 jobs in Louisiana and 18,760 nationally was found significant)). In *Beltran v. Astrue*, 700 F.3d 386, 389-90 (9th Cir. 2012), the court found that 135 regional jobs and 1,680 national jobs was not significant. The court specifically stated that "[a]lthough 1,680 jobs might seem a 'significant number' standing alone, distributing these jobs between several regions across the nation shows that it is not 'significant' after all."

In this case, the ALJ identified three job categories: Work Ticket Distributor, with 278,490 jobs in the national economy; Usher, with 106,860 jobs in the national economy; and Ironer, with 218,740 jobs in the national economy. (T. 19-20). At the hearing, the VE testified that these numbers were Occupational Employment Statistics ("OES") figures that apply to broader job classifications which include multiple job titles. (T. 66). The VE then looked up the "individual numbers" for each particular job title, which he stated were only "estimated" numbers. (T. 67). For the Work Ticket Distributor, the number was 177, and for the Usher, the number was 4,803. (T. 67).

24

The "SkillTRAN" computer program used by the VE did not have a specific number for the Ironer job title. (T. 67). The VE did not clarify whether the "individual" numbers for the particular job classification related to the national economy or some subset thereof.[21]

The ALJ found that "[e]ven though the [VE] listed limited actual job numbers for specific DOT titles, the numbers were only estimates that were not from any job databases. I rely upon the numbers listed above from the OES job categories." (T. 20). The ALJ determined that, even though the OES statistics applied to job classifications containing multiple job titles, the VE's opinion was still sufficient evidence that there was a significant number of jobs in the "national economy" that the plaintiff could perform. (*Id.*)

Generally, the OES numbers in this case are sufficient. There are over 200,000 jobs in two of the categories that the VE listed and over 100,000 in the third category. In *Williams v. Colvin*, No. 5:13-CV-180, 2014 WL 1681707, at *13 (D. Vt. Apr. 28, 2014), *adopting* Rep. Rec.), the court found "no error in the VE's reliance on OES numbers instead of DOT numbers, particularly when one of the OES categories only had one DOT code, and thus, no reduction of the OES numbers was required. The court in *Williams* also cited *Brault*, for the proposition that it was sufficient that the VE identified "the sources he generally consulted to determine [the job numbers]," and

---

[21] While state and local figures are not required because the regulation specifically states that "work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country," (20 C.F.R. § 404.1566(a)), often the state and local numbers are listed in addition to national figures.

noting the "marked absence of any applicable regulation or decision of th[e] Court requiring a vocational expert to identify with greater specificity the source of his figures or provide supporting documentation." *Id.* (quoting *Brault*, 683 F.3d at 450; *Galiotti v. Astrue*, 266 F. App'x 66, 68 (2d Cir. 2008) (internal quotations omitted, alterations in original)). However, the "individual" numbers as to which the VE testified, depending on what they actually represent, appear to fall into the category that the above-cited cases found to be "insufficient."

The VE's testimony is unclear regarding what the "individual" job estimates covered. Finally, the VE testified that there was no "estimate" for the third job, but that does not appear to mean that there are "no" jobs for that position.[22] Because the original OES numbers are so large, the reduced numbers do not seem to make sense, and the court will not speculate upon what the VE was attempting to convey. In his decision, the ALJ relied only upon the stated OES numbers when finding that there were sufficient numbers of jobs in the national economy, even though he mentioned that there were other numbers without actually discussing the difference. (T. 20).

As stated above, there is substantial debate in the case law about the statistics as stated by the VE, but generally, the courts have determined that a VE's experience allows him or her to form a reliable opinion on whether significant numbers of jobs exist in the national economy. *See e.g. Blake v. Colvin*, No. 2:14-CV-52, 2015 WL 3454736, at *9 (D. Vt. May 29, 2015) (discussing inter alia *Vandermark, supra*).

---

[22] The VE specifically stated that "again, judge, these are just DOT employment estimates . . . . from the SkillTRAN program." (T. 67).

Although it appears that there were significant number of jobs to which the VE testified in the case, if the RFC changes based on additional review, the ALJ will need to address the issue with a new VE.  Even if the RFC does not change, the ALJ should clarify the job numbers with a VE because the testimony below was not completely clear.

## VIII.  <u>NATURE OF REMAND</u>

### A.    Legal Standards

Remand to the Commissioner for further development of the evidence is appropriate when there are gaps in the administrative record or where the ALJ has applied an improper legal standard. *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999).  Reversal for calculation of benefits is appropriate only if the record contains persuasive proof of disability and a remand for further evidentiary proceedings would serve no useful purpose. *Id.*

### B.    Application

This court has found that the ALJ's decision is not supported by substantial evidence.  In this case, the court concludes that further review is necessary to make a proper determination of plaintiff's RFC, but that a remand for calculation of benefits is not appropriate.  Depending upon the resolution of the RFC issue, it may be necessary to utilize the services of a VE.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision be **REVERSED**, and the case be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further

administrative proceedings consistent with this opinion.

Dated: March 7, 2016

Hon. Andrew T. Baxter
U.S. Magistrate Judge